Patricio **MENDOZA–ACOSTA** a/k/a Guadalupe H. Aguilar, Appellant,

v.

**UNITED STATES** of America, Appellee.

No. 21754.

United States Court of Appeals, District of Columbia Circuit.

Argued Oct. 31, 1968.

Decided June 30, 1970.

---

Mr. Marshall E. Miller, Washington, D. C. (appointed by this court), for appellant at the hearing following remand.

Mr. William H. Collins, Jr., Asst. U. S. Atty., for appellee.

Before PRETTYMAN [*] and DANA-HER, Senior Circuit Judges, and WRIGHT, Circuit Judge.

PER CURIAM:

Following argument we remanded pursuant to our opinion [1] that a supplemental hearing might be had. We were concerned for no *Stovall* [2] inquiry had been conducted at trial, and there was no record upon which to determine whether identification testimony in court related back to an independent source or had stemmed from an unnecessarily suggestive confrontation [3] on the morning of the appellant's arrest. The trial judge, on March 4, 1970, filed his findings and conclusions of law based upon a complete transcript of the supplemental hearings. We have carefully reviewed the entire trial record, as so supplemented, and now outline the pertinent background in somewhat more detail than we had done in our first opinion.

I

The appellant and his wife at one time had resided in apartment 35, 1465 Columbia Road, in Washington. Prior to that marriage, the appellant's wife had lived with Leticia Salazar, the murder victim. As of October 9, 1966, the day of her murder, Miss Salazar had as her room-mate in apartment 41, 1465 Columbia Road, one Minerva Reyes. There the appellant and his wife had visited from time to time.

In the spring of 1966, the appellant and his wife went to live on the Vischer farm at La Plata, Maryland, where the appellant had secured employment. Shortly thereafter the appellant's wife went to Mexico for several weeks, during which time Minerva Reyes spent weekends with the appellant. The appellant asked the Vischers not to tell his wife of Minerva's visits. Minerva became pregnant by the appellant, and gave birth on November 26, 1966.

On October 8, 1966, Minerva went to Waldorf, Maryland, was met by the appellant and his wife, and then stayed overnight at the appellant's house on the Vischer farm. The next day, appellant and his wife drove her in a blue station wagon to Washington, and dropped her at her place of employment.

Husband and wife then drove to the Marenco apartment at 1763 Columbia Road, N.W.,[4] about three blocks from the Salazar-Reyes apartment. Mrs. Marenco was giving a party. The appellant there had drinks of beer and whiskey, and by three o'clock had disappeared, having taken departure unnoticed by the group. About seven-thirty p.m. he reappeared, being met at the door by his waiting wife. In the meantime he had changed his clothes.[5] Uninjured when he had left the party, he explained to his wife that he "had smashed [his finger] on the car door." He had been seen earlier wearing a gold chain and medal which his wife had brought to him from Mexico.

In apartment 33 at 1465 Columbia Road lived the Cuenca sisters, who often

---

[*] Senior Circuit Judge Prettyman has taken no part in our consideration of the proceedings after remand or in this opinion.

[1.] Mendoza-Acosta a/k/a Guadalupe H. Aguilar v. United States, 133 U.S.App. D.C. 91, 408 F.2d 1294 (1969).

[2.] Stovall v. Denno, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967).

[3.] At La Plata, Maryland, local officers, prior to the appellant's waiver of extradition proceedings, conducted a line-up before three identifying witnesses. This appellant, a Mexican with a moustache, was displayed with three young men of Anglo-Saxon appearance, none with a moustache.

[4.] The blue station wagon was parked in front of 1763 Columbia Road. A drive of 35 miles to La Plata might take about one hour, and so to return.

[5.] Miss Reyes testified he had not brought a change of clothes so far as she knew. The appellant's wife elected not to testify.

visited the victim, Leticia Salazar. Teresa Cuenca saw the victim during the morning of October 9. Miss Salazar was to join the sisters at five p.m., but did not appear. Teresa Cuenca then went upstairs to the Salazar apartment where she saw blood on the wall. Terrified, she waited for sister Toflia who, about six o'clock, investigated further and found the Salazar woman's body. Police were then notified.

## II

Investigation began at once. No occupant of the premises had become aware of commotion in the Salazar-Reyes apartment. Officers found blood spots on each staircase between the various floors. There were blood spots here and there on the sidewalk leading in the direction to where the blue station wagon had been parked. Three different boys, the youngest 8 and the eldest 14 years of age, were located.

One had seen a man leave the apartment house and walk rapidly up the street. As he passed along, each of the other two boys had seen him. One fixed the time as about 4 p.m. for he had just left his residence following the conclusion of a World Series baseball game. Although the afternoon was bright and sunny, it was chilly. The man was bare from the waist up. He had black hair and a moustache. He was wearing a medal or a cross on a chain about his neck. He had a shirt wrapped around one hand, and he seemed to be bleeding. He was "Spanish-looking."

Equipped with such information, the police resumed inquiry among the residents at 1465 Columbia Road. Teresa Cuenca said that the description fitted the man known to her as Guadalupe Aguilar. By 8 p.m. Minerva Reyes had returned expecting to enter her apartment only to be barred by the police.

Just exactly what information she provided we do not know, but we may surmise, for within an hour police had telephoned to Mrs. Vischer, had learned that the Vischer's blue station wagon had been missing all day and that the appellant had been given permission to drive it. In Part I we have summarized information which was gleaned as the story unfolded, with the result that about 2:30 in the morning of October 10th, Metropolitan Police appeared at the Vischer farm in La Plata.

The blue station wagon was found at the cottage occupied by the appellant. Clean when borrowed by the appellant, that car now had extensive blood stains on the car seat, the floor mat and gearshift. Enlisting the aid of Maryland authorities and in the presence of Mr. Vischer, the police knocked on the cottage door, and presently, the appellant appeared. He was warned of his rights but told the officers that indeed he had been in Washington the previous day and evening.

Such was the background for the district court's conclusion that what was later to predicate an in-court identification of the appellant had stemmed from an independent source. The description initially furnished by the three boys had led to the recognition of this appellant.

Since Maryland authorities before granting extradition required identification at La Plata, the three boys were brought before a Maryland judge the next morning.[6]

## III

Our careful review of the supplemental transcript satisfies us that there has here been no denial of due process. The findings and conclusions set forth in the Memorandum filed by the District Judge after the remand hearing are fully supported. There has been compliance with the principles considered *en banc* and

6. We have no doubt that the Maryland identification was impermissibly suggestive, see note 3, *supra,* but no evidence was received at trial concerning the La Plata line-up. Two of the boys at trial identified the appellant as the man they had first described to police.

thereafter announced in Clemons v. United States.[7]

Moreover were it to be contended that the in-court identification had become impregnated by impressions created at the improper La Plata line-up, the totality of circumstances obliterates any such effect. For example, the blood on the wall in the hallway outside apartment 41 was this appellant's rare Type B. So it was with reference to the Newport cigarette butt which police found at the apartment. The appellant was known to smoke Newports, and his fingerprint was located on a partial pack of Newports found in the apartment.

The inferences to be drawn from each of the series of facts as outlined and from others not mentioned, and circumstances which were established beyond peradventure, support conviction beyond a reasonable doubt.[8] Without our speculating as to motive, the coroner's opinion evidence indicated that the victim had been engaged in a struggle trying to defend herself, for there were seven slash wounds on her lower left arm and eight such wounds on her right lower arm and hand. The massive wounds on other parts of her body had been inflicted by a heavy sharp instrument. Such was a hooked pruning tool with a five-inch blade which appellant when at work carried in his pocket, but which was missing from the Vischer tool-shed when a search was made for it after the event. That the appellant had ample time to return to La Plata, to wash up, to change his clothes and return for his wife is clear. The finger, which he told his wife had been smashed in the car door, had been injured on the car motor, he told police. And he still wore the gold chain and medal.

Even at the remanded hearing the appellant chose not to testify.

Affirmed.

---

7. 133 U.S.App.D.C. 27, 408 F.2d 1230 (1968); cert. denied, 394 U.S. 964, 83 S.Ct. 1906, 10 L.Ed.2d 1066 (1969).

8. See Stovall v. Denno, supra, note 2; cf. Bryant v. United States, 135 U.S.App. D.C. 138, 140–141, 417 F.2d 555, 557–558 (1969).