# United States Court of Appeals
## For the First Circuit

No. 05-1184

UNITED STATES OF AMERICA,
Appellee,

v.

RAFAEL A. GONZÁLEZ-VÉLEZ,
Defendant, Appellant.

---

No. 05-1758

UNITED STATES OF AMERICA,
Appellee,

v.

JOSÉ A. RAMOS-ROMERO,
Defendant, Appellant.

---

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO
[Hon. Salvador E. Casellas, U.S. District Judge]

---

Before
Torruella, Selya, and Dyk,[*]
Circuit Judges.

---

María H. Sandoval, for appellant Rafael A. González-Vélez.
José C. Romo-Matienzo, for appellant José A. Ramos-Romero.
Thomas F. Klumper, Assistant United States Attorney, with whom
H.S. García, United States Attorney, and Nelson Pérez-Sosa,
Assistant United States Attorney, Senior Appellate Attorney, were
on brief, for appellee.

---

[*]  Of the Federal Circuit, sitting by designation.

October 13, 2006

**TORRUELLA**, **Circuit Judge**.  On July 12, 2004, a jury convicted Rafael A. González-Vélez ("González") and José A. Ramos-Romero ("Ramos") of one count of conspiracy to distribute a controlled substance in violation of 21 U.S.C. § 846.  In addition, Ramos was convicted of distribution of a controlled substance in violation of 21 U.S.C. § 841(a)(2).  Ramos and González now appeal their convictions and their sentences.

## I.  Background

Between 2000 and 2002, a drug point known as "Las Malvinas" was operated in the Luis Lloréns Torres housing project in Puerto Rico.  José Luis Rivera González ("Rivera") headed the drug point until his death in 2002.  Between the summer of 2001 and October 2002, the FBI and the Police of Puerto Rico conducted an investigation of the drug point.  This investigation culminated in a grand jury indictment on February 13, 2003 against nine persons including González and Ramos.  The indictment charged González and Ramos with conspiracy to distribute controlled substances including cocaine, crack cocaine, heroin and marijuana in violation of 21 U.S.C. § 846.  The indictment also charged Ramos with distribution of a controlled substance in violation of 21 U.S.C. § 841(a)(2).  Five of the seven other defendants charged in the indictment pleaded guilty; two others were tried separately.  González and Ramos proceeded to trial on June 30, 2004.

## A.  Jury Selection

Fifty-six jurors were summoned and appeared for trial. During voir dire, González requested and the district court agreed to ask potential jurors whether they lived or had lived in a public housing project.  No juror answered affirmatively.  After voir dire concluded and the jury was announced, Ramos objected to the composition of the jury, arguing that it had "probably no poor class or anybody relating to the public housing residence" and that public housing residents formed a distinct class.[1]  González concurred in Ramos' objection.  The court overruled the defendants' objection to jury composition.

## B.  The Trial

At trial, the Government presented testimony from FBI Agent William Ortiz regarding his surveillance of the Malvinas drug point.  The Government also presented four hours and thirty-five minutes of videotapes from a surveillance camera placed near the drug point that showed numerous drug transactions.  Police of Puerto Rico Officer Felipe Casiano Caraballo ("Casiano") testified that he had observed both Ramos and González near the drug point and had "intervened" with Ramos on a number of occasions.  On cross-examination, Casiano admitted that he had never observed

---

[1]  Counsel for Ramos stated "[The] percentage of people who live in public housing, this is maybe thirty or forty percent of the general population, and [Ramos] is being excluded and prejudiced because of this."

-4-

González committing a crime. Jesús Matías Cruz ("Matías"), a cooperating witness, testified that he had observed drug sales at the drug point and had observed Ramos with two weapons while in the company of Rivera. Matías also testified that he and Ramos "cut" a "baseball-sized" rock of crack for packaging, during which Ramos told him that the rock had been provided by González. Matías further testified that he had overheard Rivera asking González for "pepper," which was purportedly a code-word for cocaine, and that he later observed González providing Rivera with a large plastic bag with "stones" or "bricks" inside. Matías also made a recording of a conversation between Rivera and González about the packaging, processing, and payment for cocaine. In addition, Angel Obregón Fontánez ("Obregón"), one of the defendants charged in the indictment who pleaded guilty, testified that he had observed González selling between one-eighth and one-half kilogram of cocaine on credit to Rivera.[2] Obregón also testified that Ramos was a processor of drugs and a "triggerman" for the enterprise. Lastly, the Government offered physical evidence, including a notebook (the "ledger") containing records of cocaine transactions involving a person named "Junito," which was González's nickname.

---

[2] The number and scope of transactions is in dispute. After being asked whether he had observed González engage in more than ten drug sales to Rivera, Obregón said "Yes." However, on cross-examination, Obregón said that he had seen "a couple." In addition, Obregón could not explain the difference in quantity between "an eighth" and "a half" kilogram of cocaine, but stated that he knew they were different quantities.

-5-

At the conclusion of the Government's case, González and Ramos moved for judgments of acquittal under Fed. R. Crim. P. 29(a)[3]. The court denied the motions.

González presented four character witnesses on his behalf, all of whom testified that González was law-abiding and had good character. González and Ramos again moved for judgments of acquittal under Fed. R. Crim. P. 29(a) after the defense case concluded; the motions were denied.

### C. The Jury Charge and Verdict Form

At the conclusion of the trial, all parties attended a jury charge conference. At the conference, Ramos objected to the verdict form and requested a bifurcated verdict which would have required the jury to find the specific amount of drugs attributable to each defendant. The court denied the request. The court gave the jury, in part, the following charge:

> Count one of the indictment charges that the defendants conspired with one another to distribute controlled substances, that is to say, five kilograms or more of cocaine and a detectable amount of cocaine base, both Schedule II narcotic drug controlled substances. . . . To find any defendant

---

[3] Fed. R. Crim. P. 29(a) provides: "After the government closes its evidence or after the close of all the evidence, the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction. The court may on its own consider whether the evidence is insufficient to sustain a conviction. If the court denies a motion for a judgment of acquittal at the close of the government's evidence, the defendant may offer evidence without having reserved the right to do so."

guilty of conspiracy to distribute controlled [sic] you must be convinced that the government has proven each of the following things beyond a reasonable doubt: First, that the agreement specified in the indictment, and not some other agreement or agreements, existed between at least two people to distribute controlled substances; and Second, that the defendants knowingly and willfully joined in that agreement. . . . To find a defendant guilty of the offense charged in the indictment, you do not have to find that the defendant conspired to distribute the specific amount of controlled substances alleged in the indictment. To find a defendant guilty, you need only find that he conspired to distribute some quantity of controlled substances as alleged in count one. If you find that a defendant conspired to distribute some quantity of controlled substance, you will be asked to make a special finding as to the quantity of controlled substance that he conspired to distribute. . . . Both defendants are named in count one of the indictment. The evidence pertaining to each defendant should be considered separately and individually. The fact that you may find of [sic] the defendants guilty or not guilty, should not control your verdict as to the other defendant.

Neither party objected to the jury charge. The jury was given a verdict form which asked the jury to determine the guilt of each defendant and included a special interrogatory which asked the jury to find if the amount of cocaine involved in the conspiracy

was five kilograms or more.[4] At the request of the Government, the verdict form was read to the jury.

On July 12, 2004, the jury returned a verdict finding both defendants guilty of the charged offenses and a special verdict finding that the amount of cocaine involved in the conspiracy was five kilograms or more. After the verdict, González made a renewed motion for a judgment of acquittal under Fed. R. Crim. P. 29(c)(1),[5] which was denied. Ramos filed a motion to vacate the conviction and for a new trial under Fed. R. Crim. P. 33(a).[6] The court denied the motion.

---

[4] The special interrogatory read, in part:

"3.  A.    If you find either of the defendants guilty as to Count One, do you find that the amount of cocaine involved in the conspiracy was five (5) kilograms or more:

    ‾‾‾‾                         ‾‾‾‾
    YES                          NO

If you answered YES to question 3(A), sign and date the verdict form.  If you answered NO to question 3(A), then proceed to question 3(B)."

[5] Fed. R. Crim. P. 29(c)(1) provides:  "A defendant may move for a judgment of acquittal, or renew such a motion, within 7 days after a guilty verdict or after the court discharges the jury, whichever is later."

[6] Fed. R. Crim. P. 33(a) provides:  "Upon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires.  If the case was tried without a jury, the court may take additional testimony and enter a new judgment."

-8-

## D.  Sentencing

Pre-sentencing reports were transmitted to both defendants.  On December 23, 2004, the court held a sentencing hearing for González.  During the hearing, González argued that the court needed to make an individualized finding of drug quantity. The court responded that this was a matter reserved to the jury, and that the jury had already rendered a sufficient finding.  The court determined an offense level of thirty-two based on the minimum of five kilograms of cocaine involved in the conspiracy and a criminal history category of I.  The sentencing guidelines recommended a range of 121 to 151 months of imprisonment; González was sentenced to 135 months in prison.

On April 8, 2005, the court held a sentencing hearing for Ramos.  The court determined that Ramos was a career offender under U.S.S.G. § 4B1.1, which gave him a criminal history category of VI. For the conspiracy charge, the court determined an offense level of thirty-seven based on the minimum of five kilograms of cocaine involved in the conspiracy and the fact that Ramos was a career offender.  The sentencing guidelines recommended a range of 360 months to life imprisonment; Ramos was sentenced to 365 months of imprisonment on the conspiracy charge.  On the distribution charge, Ramos was sentenced to sixty months of imprisonment to be served consecutively with the sentence for conspiracy.  González and Ramos

now present various challenges to their convictions and sentences on appeal.

## II.  Discussion

We will first address the claims made jointly by González and Ramos regarding the jury instructions and special verdict form, and then proceed to González's and Ramos' individual claims.

### A.  The Jury Instructions and Special Verdict Form

The essence of González's and Ramos' appeals as to the jury instructions and special verdict form can be boiled down to two arguments.  First, González and Ramos argue that to be found guilty of conspiracy to distribute a controlled substance, the jury instructions and the special verdict form should have required the jury to make individualized findings of the amount of cocaine attributable to each defendant rather than to the conspiracy as a whole.  Second, González and Ramos argue that the Supreme Court's holdings in Apprendi v. New Jersey, 530 U.S. 466 (2000), and Blakely v. Washington, 542 U.S. 296 (2004), required individualized findings as to drug quantity for the purposes of sentencing.  We find both claims to be meritless.

In order to determine whether "all factual issues essential to the judgment . . . were fairly presented to the jury," we review properly preserved objections to the trial court's jury instructions and verdict forms de novo.  Sánchez-López v. Fuentes-Pujols, 375 F.3d 121, 134 (1st Cir. 2004) (internal quotation marks

and citation omitted).  If the objection to jury instructions or verdict forms has not been properly preserved by the defendants, we review newly raised objections using a plain error standard.[7]  Id. To satisfy the plain error standard, a criminal defendant must show: "(1) that an error occurred (2) which was clear or obvious and which not only (3) affected the defendant's substantial rights, but also (4) seriously impaired the fairness, integrity, or public reputation of judicial proceedings."  United States v. Duarte, 246 F.3d 56, 60 (1st Cir. 2001).  This standard is exceedingly difficult to satisfy in jury instruction cases: "[T]he plain error hurdle, high in all events, nowhere looms larger than in the context of alleged instructional errors."  United States v. Paniagua-Ramos, 251 F.3d 242, 246 (1st Cir. 2001).

## 1.  The Jury Instructions

Neither González nor Ramos entered any objections to the jury instructions.  Thus, we will look to see if the instructions constituted plain error.  Our examination of jury instructions focuses on "whether they adequately explained the law or whether

---

[7]    The Government suggests that by failing to raise their objections at the time the jury was charged, González and Ramos have waived, rather than forfeited their objections and that we may not review their claims.  However, as we noted in United States v. Nelson-Rodríguez, for an objection based on Apprendi, "[W]e think it sufficient if the defendant raises the issue at sentencing." 319 F.3d 12, 47 (1st Cir. 2003).  Although there is some discrepancy between the parties as to whether the objection was raised by either or both parties during sentencing, "we prefer to assume rather than decide that the issue was preserved in these circumstances."  Id. at 48.

-11-

they tended to confuse or mislead the jury on the controlling issues." Federico v. Order of Saint Benedict, 64 F.3d 1, 4 (1st Cir. 1995).

González and Ramos were charged with conspiracy to distribute controlled substances under 21 U.S.C. § 846. The elements of a conspiracy are "the existence of a conspiracy, the defendant's knowledge of the conspiracy, and the defendant's voluntary participation in the conspiracy." United States v. Gómez-Pabón, 911 F.2d 847, 852 (1st Cir. 1990). The quantity of drugs is not an element of conspiracy under § 846, nor is it an element of the underlying controlled substances offense under § 841 (a)(2). See United States v. Lindia, 82 F.3d 1154, 1160 (1st Cir. 1996).[8] The district court's instructions plainly instructed the jury to consider the aforementioned elements of conspiracy for each defendant, explicitly stating that, "[T]he evidence pertaining to each defendant should be considered separately and individually."

---

[8]  Some courts have suggested that, post-Apprendi, distinctions between sentencing factors and substantive elements of § 841 are somewhat untenable. See, e.g., United States v. Westmoreland, 240 F.3d 618, 632 (7th Cir. 2001) ("In light of Apprendi, we could no longer look to the clear demarcation between the elements of the crime defined by § 841 and the penalty provisions of that section as a means of avoiding the constitutional issues raised by the placement of drug quantity determination in the hands of the sentencing judge."). However, as we emphasize throughout this opinion, regardless of whether drug quantity is a sentencing factor or a substantive element, the drug quantity that determines the maximum sentence for a drug conspiracy charge under § 846 is the conspiracy-wide quantity, which the jury did determine in the present case.

-12-

It was only after each defendant's culpability was determined individually that the jury was asked to find the conspiracy-wide drug quantity--a finding that the court would need for sentencing. As we have stated, "the maximum statutory penalty available to the district court at sentencing for a defendant convicted of a drug conspiracy is based on the drug quantity and amount reflected in the jury verdict attributable to the conspiracy as a whole." United States v. Irizarry, 404 F.3d 497, 504 (1st Cir. 2005).[9] Because the jury was instructed to consider the charges against each defendant individually, the instructions did not constitute error as to the finding of guilt.

Furthermore, the jury instructions did not constitute error under Apprendi or Blakely, which require a jury to make a factual finding for any element which increases a defendant's sentence beyond the statutory maximum penalty. 530 U.S. at 490; 542 U.S. at 301. The district court instructed the jury to find the amount of cocaine involved in the conspiracy as a whole.[10] The

---

[9] This is also clear from the language of the statute, which, without any reference to an individual's role in a conspiracy, says that "[a]ny person who attempts or conspires to commit [a controlled substance offense] shall be subject to the same penalties as those prescribed for the offense." 21 U.S.C. § 846 (2006).

[10] We do not see any merit to Ramos' claim that the instructions were flawed because they make reference only to cocaine. Participation in a conspiracy to distribute cocaine alone would be sufficient to sustain a conviction under 21 U.S.C. § 846, and much evidence regarding to Ramos' involvement in the processing and selling of cocaine was presented at trial. The fact that Ramos was

-13-

amount of cocaine involved in the conspiracy sets the statutory maximum penalty for § 846. Irizarry, 404 F.3d at 504. Thus, the instructions to determine only the conspiracy-wide amount of cocaine posed no risk that the jury would fail to find an element of the offense that increased the statutory maximum penalty. Accordingly, the jury instructions did not constitute error as to sentencing.

## 2. The Special Verdict Form

Because Ramos made a timely objection to the verdict form, we will review the verdict form de novo as to his claims. González made no such objection; his claims will be reviewed for plain error. The purpose of a special verdict form is to allow "juries to specifically identify the predicates for the general verdict." United States v. Cianci, 378 F.3d 71, 91 (1st Cir. 2004). In the present case, the verdict form asked the jury to make a finding of guilty or not guilty as to each defendant for each charge and then, if either defendant was found guilty, asked the jury to determine the amount of cocaine involved in the conspiracy. As we have already stated, neither the offense of conspiracy, Lindia, 82 F.3d at 1160, nor the determination of the maximum penalty for conspiracy, Irizarry, 404 F.3d at 504, requires an individualized finding of the amount of drugs attributable to a

also involved in trafficking of heroin and marijuana would not change the outcome of the case.

specific defendant. Rather, the amount of drugs involved in the conspiracy as a whole is a predicate for sentencing purposes. See id. Because the special verdict form provided for individualized findings of guilt on each charge, the special verdict form would not have misled or confused the jury as to their determination of guilt. Thus, the special verdict form did not constitute error as to the finding of guilt.

Furthermore, there were no Apprendi or Blakely errors in the special verdict form. The jury used the special verdict form to make a finding of conspiracy-wide drug quantity. The quantity of drugs in the conspiracy determines the statutory maximum sentence.[11] See Irizarry, 404 F.3d at 504. Thus, because the statutory maximum was determined by the conspiracy-wide drug quantity, there was no need under Apprendi or Blakely for the special verdict form to allow jurors to make an individualized determination of drug quantity for each defendant. Accordingly, the special verdict form did not constitute error as to sentencing.

---

[11] González suggests that jurors were "puzzled" at the special interrogatories asking them to determine "artificial floors" corresponding to the amount of drugs involved in the conspiracy. These floors determine the maximum sentences prescribed in 21 U.S.C. § 841(b). Given the extensive testimony in the case regarding the quantity of drugs flowing through the Malvinas drug point, we think the jury was up to the task of determining whether the conspiracy involved more or less than five kilograms of cocaine.

## B. Claims Raised by González

González raises two claims: that there was insufficient evidence to find him guilty of conspiracy to commit drug trafficking under 21 U.S.C. § 846 and that the sentence he received was not issued in accordance with our decisions in United States v. Colón-Solís, 354 F.3d 101 (1st Cir. 2004), United States v. Vásquez-Molina, 389 F.3d 54 (1st Cir. 2004), or the Supreme Court's decision in United States v. Booker, 543 U.S. 220 (2005).

### 1. Insufficiency of Evidence

González argues that the evidence presented at trial was insufficient for a jury to find him guilty of conspiracy to distribute cocaine. We will review de novo a district court's denial of a defendant's motion for acquittal under Fed. R. Crim. P. 29. United States v. Rivera Ruiz, 244 F.3d 263, 266 (1st Cir. 2001). The standard is whether the evidence, "taken in the light most amicable to the prosecution, together with all reasonable inferences favorable to it, would allow a rational fact-finder to conclude beyond a reasonable doubt that the defendant was guilty as charged." United States v. Maraj, 947 F.2d 520, 523 (1st Cir. 1991). The Government "need not exclude every reasonable hypothesis of innocence, provided the record as a whole supports a conclusion of guilt beyond a reasonable doubt." United States v. Victoria-Peguero, 920 F.2d 77, 86-87 (1st Cir. 1990).

-16-

González was charged with conspiracy to distribute cocaine under 21 U.S.C. § 846. To prove that González was guilty of conspiracy to distribute cocaine, the Government needed to prove beyond a reasonable doubt "that an agreement existed to commit the underlying substantive offense (here, the distribution of drugs), that the defendant knew of the agreement, and that he opted to join in it, intending to commit the substantive offense." United States v. Gómez, 255 F.3d 31, 35 (1st Cir. 2001). During the trial, the Government offered testimony from an FBI agent, a Police of Puerto Rico officer, two cooperating witnesses, as well as hours of videotape that, taken in the light most favorable to the prosecution, shows that Rivera and others agreed to distribute cocaine and other drugs at the Malvinas drug point. A jury could reasonably infer from the testimony of the two cooperating witnesses regarding the sales of cocaine by González to Rivera, the audiotape recordings of González's conversations, and the presence of González's name in the ledger, that González was aware of the conspiracy to distribute controlled substances. See United States v. Ortiz, 966 F.2d 707, 712 (1st Cir. 1992) ("[F]actfinders may draw reasonable inferences from the evidence based on shared perceptions and understandings of the habits, practices, and inclinations of human beings."). A jury could further infer from the testimony about González's regular sales of cocaine to Rivera that González joined the agreement for the purpose of and with the

-17-

intent to distribute cocaine.  In light of the substantial amount of evidence presented, the fact that one witness could not explain the difference between an eighth and a half kilogram of cocaine or that another witness described the drugs as "stones" or "bricks" does not make irrational the jury's conclusion that González was guilty of conspiracy.  See United States v. Nishnianidze, 342 F.3d 6, 14 (1st Cir. 2003) ("[T]he jury's duty is to assess credibility, and it may accept or reject, in whole or in part, any testimony.").  Accordingly, we believe that the court was correct to deny González's motion for acquittal.

## 2.  Sentencing Errors

González challenges his sentence on the ground that the district court refused to make an individualized finding of the quantity of drugs that could be attributed to his participation in the conspiracy.  Since González challenges the sentencing court's conclusion of law that such a finding was unnecessary, we will review it de novo.  United States v. Brennick, 337 F.3d 107, 110 (1st Cir. 2003).

In Colón-Solís, we held that "when a district court determines drug quantity for the purpose of sentencing a defendant convicted of participating in a drug-trafficking conspiracy, the court is required to make an individualized finding as to drug amounts attributable to, or foreseeable by, that defendant."  354 F.3d at 103.  A defendant can only be sentenced on the basis of

-18-

drugs he handled, anticipated handling, or for drugs he could reasonably foresee being used in the conspiracy; all of the drugs in a conspiracy may not be automatically assigned to an individual defendant. United States v. Sepúlveda, 15 F.3d 1161, 1197 (1st Cir. 1993).

Both González and the Government agree that the sentencing court failed to make such an individualized finding and that this constitutes error. Their only difference is remedy: González believes that the jury needed to determine drug quantity and thus a new trial is merited, whereas the Government believes that a judge could make the determination without the jury and resentencing would be sufficient. On this subject, we have been quite clear: "[O]nce the jury has determined that the conspiracy involved a type and quantity of drugs sufficient to justify a sentence above the default statutory maximum and has found a particular defendant guilty of participation in the conspiracy, the judge lawfully may determine the drug quantity attributable to that defendant and sentence him accordingly." Derman v. United States, 298 F.3d 34, 43 (1st Cir. 2002). The principal enunciated in Derman survives the Supreme Court's subsequent decisions in Blakely and Booker. See United States v. Malouf, No. 05-2245 (1st Cir. Oct. 13, 2006). Consequently, we remand González's case for resentencing in accordance with our decisions. Because we have remanded González's case for resentencing on this ground, we do not

-19-

need to decide now the merits of González's other sentencing claims.

## C.  Claims Raised by Ramos

Ramos makes two claims.  First, Ramos argues that the trial was flawed because jury selection violated the Sixth Amendment and the Supreme Court's decisions in Taylor v. Louisiana, 419 U.S. 522 (1975), and Duren v. Missouri, 439 U.S. 357 (1979), requiring that juries be selected from a pool representative of the community at large.  Ramos argues that the jury pool was flawed because it did not include persons who lived in public housing. Second, Ramos argues that his sentence was flawed under Apprendi, 530 U.S. 366, and United States v. Vaughn, 430 F.3d 518 (2d Cir. 2005), because the jury did not find that Ramos was individually involved in the distribution of five kilograms of cocaine and thus the court could not sentence him using the maximum penalty set by 21 U.S.C. § 841(b)(1)(A).

## 1.  Jury Selection

We review de novo a district court's rulings of law. United States v. Royal, 174 F.3d 1, 5 (1st Cir. 1999).  The district court denied Ramos' motion for a new trial on the ground that the jury pool was unfairly composed.  In order to establish a claim that the jury selection process violates the constitutional requirement that the jury be selected from a pool representative of the community at large, the challenging party must establish: "(1)

-20-

that the group alleged to be excluded is a 'distinctive' group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process." United States v. Benjamin, 252 F.3d 1, 12 (1st Cir. 2001) (citing Duren, 439 U.S. at 364). The burden is on the challenging party to establish a case of unconstitutional underrepresentation. United States v. Pion, 25 F.3d 18, 22 (1st Cir. 1994).

Ramos has presented no evidence that would establish any one of the three prongs of the Duren test. As for the first prong, Ramos admits that there is no case law supporting the argument that public housing residents are a distinctive group. Ramos argues that public housing residents form a distinctive group because the Department of Housing and Urban Development restricts eligibility for public housing. This argument is clearly insufficient -- it would allow a defendant to make a constitutional claim out of the fact that a jury pool lacked a person from any group that limits its membership. See United States v. Lynch, 792 F.2d 269, 271 (1st Cir. 1986) ("[I]f this grouping qualifies as a 'cognizable group' for purposes of Duren v. Missouri analysis, it is hard to see what grouping will not similarly qualify. The result could soon be that any defendant showing that the venire deviated statistically from

-21-

a perfect community cross-section would have established a prima facie violation of the Sixth Amendment.").

Furthermore, Ramos has presented no evidence that the representation of public housing residents in the jury pool is unfairly or unreasonably disproportionate. Counsel for Ramos told the court that he estimated that public housing residents formed between 30% and 40% of Puerto Rico's population but offered no support for this contention. Ramos now uses the population of just one of ten public housing projects in Caguas, a town of 142,161 residents, to conclude that 10% is a "fair estimate" of the proportion of the population of Puerto Rico living in public housing. No reasonable person would find this evidence sufficient to establish that, because a jury pool of fifty-six persons had no public housing residents, they are unfairly or unreasonably underrepresented in juries.

Lastly, Ramos presents no evidence that there has been a systematic exclusion of public housing residents. To the contrary, as the Government points out, the Jury Plan for the United States District Court for the District of Puerto Rico forms its jury pool from voter registration lists, a method previously upheld by this court. See United States v. Butera, 420 F.2d 564, 573 (1st Cir. 1970) ("It has become well-established that voter registration lists are appropriate for use in jury selection systems."). Jurors are also required to be United States citizens, at least eighteen

-22-

years old, and residents of Puerto Rico for at least one year, none of which would suggest systematic exclusion of public housing residents.  Last, jurors are required to be proficient in English, a requirement we have held to be justified by "the overwhelming national interest served by the use of English in a United States court."  United States v. Aponte-Suárez, 905 F.2d 483, 492 (1st Cir. 1990).  Accordingly, we do not find that Ramos has sustained his Sixth Amendment claim regarding jury selection.

## 2.  Sentencing Error

We review the legal conclusions of a sentencing court de novo but apply a clear error standard to the factual determinations of the court.  United States v. Mateo, 271 F.3d 11, 13 (1st Cir. 2001).  Ramos argues that his sentence violates the Supreme Court's decision in Apprendi, 530 U.S. 466, as interpreted by United States v. Vaughn, 430 F.2d 518, 525 (2d Cir. 2005), because the jury did not make an individualized finding that he was involved with more than five kilograms of cocaine.[12]  Specifically, Ramos argues that,

---

[12]  Because he was sentenced as a career offender, Ramos does not make the argument, as González did, that his sentence was flawed under Colón-Solís, 354 F.3d 101.  Under Sentencing Guidelines § 4B1.1, a career offender, such as Ramos, convicted of an offense for which the maximum penalty is life imprisonment, such as conspiracy to distribute five or more kilograms of cocaine, is assigned an offense level of 37.  Based on an offense level of 37 and a criminal history category of VI, the sentencing guidelines recommend a sentence range of 360 months to life imprisonment. U.S.S.G. § 5A.  Thus, unlike González, for whom sentencing required an individualized determination of drug quantity under U.S.S.G. §§ 1B1.3 and 2D1.1(c), the determination of Ramos' sentence was based solely on his prior criminal history.

-23-

because the jury did not find that he was individually involved with all five kilograms of cocaine, the maximum sentence should be dictated by 21 U.S.C. § 841(b)(1)(c), which provides a maximum sentence of twenty years for the distribution of any amount of a controlled substance.

In Apprendi, the Supreme Court stated that "any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury." 530 U.S. at 490. A jury found Ramos guilty of conspiracy to distribute cocaine under 21 U.S.C. § 846. Section 846 provides that a person found guilty of conspiracy to distribute cocaine shall be subject to the penalties for the offense that was the subject of the conspiracy. Thus, regardless of the amount of cocaine that he was individually involved in distributing, Ramos was subject to the penalty imposed for the conspiracy-wide amount of cocaine. After extensive testimony by multiple witnesses about the precise quantities of cocaine that passed through the Las Malvinas drug point on a weekly basis, the jury found in its special verdict that the conspiracy involved the distribution of five or more kilograms of cocaine. Under 21 U.S.C. § 841(b)(1)(A)(1), the maximum penalty for the distribution of five or more kilograms of cocaine is life imprisonment. Accordingly, life imprisonment is also the maximum penalty for participation in a conspiracy to distribute five or more kilograms of cocaine. Ramos was sentenced to 365 months of

imprisonment for his participation in the conspiracy. Because Ramos' sentence did not exceed the statutory maximum penalty, there can be no Apprendi error. See United States v. Johnstone, 251 F.3d 281, 285 (1st Cir. 2001) ("No Apprendi violation occurs, however, when the district court sentences a defendant below the statutory maximum."). The district court sentenced Ramos to 365 months of imprisonment because it found that Ramos was a career offender under U.S.S.G. § 4B1.1, and the sentencing guidelines recommended a sentencing range of 360 months to life imprisonment. As we have stated previously, a sentence that is less than the statutory maximum penalty does not violate Apprendi "even if a fact determined by the court under a preponderance standard lengthens the sentence imposed." Johnstone, 251 F.3d at 285; see also Vaughn, 430 F.2d at 525 ("[D]istrict courts' authority to determine sentencing factors by a preponderance of the evidence endures and does not violate the Due Process Clause of the Fifth Amendment."). Accordingly, Ramos' claim of improper sentencing is meritless.

### III. Conclusion

For the reasons stated above, we vacate González's sentence and remand the matter of González's sentencing to the district court for an individualized determination of drug quantity attributable to González. With respect to all other matters, we affirm the decisions of the district court.

**The conviction and sentence in No. 05-1758 is affirmed. The conviction in No. 05-1184 is affirmed. The sentence in No. 05-1184 is vacated and that case is remanded for resentencing.**