# United States Court of Appeals
## For the First Circuit

No. 11-2446

UNITED STATES,

Appellee,

v.

CHRISTOPHER D. WILLSON,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Rya W. Zobel, U.S. District Judge]

Before

Lynch, Chief Judge,
Souter,* Associate Justice,
and Selya, Circuit Judge.

James L. Sultan, with whom Kerry A. Haberlin and Rankin & Sultan were on brief, for appellant.
Steven H. Breslow, United States Attorney's Office, District of Massachusetts, with whom Carmen M. Ortiz, United States Attorney, and Randall E. Kromm, United States Attorney's Office, District of Massachusetts, were on brief, for appellee.

February 15, 2013

---

* Hon. David H. Souter, Associate Justice (Ret.) of the Supreme Court of the United States, sitting by designation.

**LYNCH**, <u>Chief Judge</u>.  Christopher Willson, an engineer for battery producer Electric Vehicles Worldwide (EVW), was convicted of submitting false invoices and conspiring to defraud the Federal Transit Administration (FTA) in connection with federal grants to develop a battery for electric mass transit.  Willson appeals, arguing that the government's evidence was insufficient to support his conviction and that the trial court erred in not giving his requested jury instructions on condonation and reasonable interpretation of regulations.  We affirm.

I.

The government funding at the center of this case was the result of an earmark that a Massachusetts Congressman secured through an appropriations bill passed in October of 1999.  The Congressman hoped that EVW's proposals to develop technology for electric mass transit -- initially an all-electric bus, eventually just a battery -- would bring environmentally friendly "green" jobs to Pittsfield, a city in his district that was struggling economically. Accordingly, he earmarked FTA research funds for the Pittsfield Economic Development Authority (PEDA), with the understanding that the money ultimately would go to EVW.[1]  <u>See</u> Department of Transportation and Related Agencies Appropriations Act, Pub. L. No. 106-69, 113 Stat. 986, 1001 (1999).

---

[1]  At trial, EVW was also referred to as ElectraStor, LLC, a wholly-owned subsidiary of EVW.  We use EVW to refer to both companies.

In late 1999 or early 2000, the PEDA in turn contracted with the Pioneer Valley Transit Authority (PVTA), a local agency with experience in federal grant administration, to manage the earmarked funds for EVW. The PVTA, in March 2000, entered into a consortium agreement with EVW, under which the PVTA would receive funds from the FTA and then pass them on to EVW. The agreement mandated that EVW match all grant funds "on a dollar for dollar basis in cash, in kind, or with any other consideration which qualifies for such match." It also mandated that EVW "take all actions necessary or desirable to comply with applicable laws and regulations relating to the . . . [f]unds." These regulations included the FTA "Master Agreement," a document issued annually and attached to all FTA grants, which required, inter alia, that grant recipients strictly adhere to any funding match requirement and that only "approved in-kind resources" be counted as matching contributions.

In June 2000, the PVTA formally submitted to the FTA an application for the earmarked funds. The application described EVW's proposal in detail and recounted the relevant industry experience of the company's principals, including its Chief Executive Officer Michael Armitage. After finalizing a budget for EVW's work, the FTA approved the application and signed a cooperative agreement with the PVTA governing distribution of the funds. This agreement, numbered MA-26-7050 (the "7050 agreement"),

limited the FTA's "[m]aximum . . . [p]articipation" in the project to 50 percent of incurred costs. The FTA and PVTA later amended the agreement three times to increase the funding amount and extend the project period.

In the fall of 2000, EVW recruited Willson, at the time an engineer at the battery producer Energizer, to serve as the company's chief scientist. Willson joined the company in November, and work soon began on developing a rechargeable battery for mass transit. As agreed, the FTA funded EVW's development efforts through payments administered by the PVTA. From approximately December 2000 through March 2005, EVW submitted 27 invoices under the 7050 agreement to the PVTA, where a grant manager and the agency's chief financial officer reviewed them before forwarding them to the FTA. Each invoice was a single page; it identified the expenses for which EVW sought reimbursement and listed the percentage of total project expenses "drawn and pending" from the FTA as of the invoice date. The invoices indicated that the FTA's total expenditures never exceeded 50 percent of the project costs, although some invoices requested payment of more than 50 percent of costs incurred within that specific invoice period. The FTA ultimately paid all of these invoices.

The initial promise of EVW's battery work gave way to technical problems in late 2002, which led to layoffs and employee departures in 2003 and 2004. Willson's project manager departed in

mid-2004, leaving Willson to prepare the invoices himself. As Willson later testified, he had no relevant experience and received no training, nor did he read the FTA Master Agreement, any of the FTA federal funding regulations, or the 7050 agreement between the FTA and PVTA. Rather, Willson said he simply tried to copy what his manager had done. At one point he proposed restating the invoices, ostensibly so that he could better account for EVW's expenses and the FTA's payments, but a PVTA official apparently told him not to do so.

EVW did not overcome its technical problems, and by early 2005, with the 7050 agreement set to expire, the company had run out of money. Instead of disclosing this information to federal authorities, Willson asked the Congressman to secure continued funding for the company's work, and in July 2005 he succeeded in getting the FTA to enter into a new cooperative agreement with the PVTA. This agreement, numbered MA-26-7101 (the "7101 agreement"), superseded the 7050 agreement. The 7101 agreement continued to fund EVW's battery development efforts which had started under the 7050 agreement, but it specifically did not cover expenses incurred before it was issued (the "pre-award authority"). Moreover, the 7101 agreement retained the 50 percent funding match requirement that limited FTA disbursements to no more than half of EVW's development costs.

Over the remaining months of 2005, Willson submitted five invoices to the PVTA (and ultimately the FTA) under the 7101 agreement. As before, each invoice was a single page that identified the expenses for which EVW sought reimbursement and listed the percentage of total expenses drawn and pending from the FTA through the invoice date. The first invoice Willson submitted under the 7101 agreement, however, began from a total drawn-and-pending balance of zero, and the later invoices reflected amounts drawn and pending under the 7101 agreement only. Each invoice stated, incorrectly, that EVW was meeting its funding match requirement.

In fact, EVW was by then desperate for money, and its first two invoices depleted virtually the entire balance of FTA funds available under the 7101 agreement. Accordingly, the FTA did not pay any of the 7101 agreement invoices beyond the first two. (Commerce Funding, a factoring company that advanced EVW funds against the FTA distributions, paid the next two, seemingly unaware that no further federal funds would be distributed.) In any event, EVW received no federal funds after 2005.

In the spring of 2006, the federal Department of Transportation (DOT) audited EVW. The audit team met with Willson and CEO Michael Armitage. In her testimony at trial, DOT auditor Mary Thomas paraphrased Willson as having admitted that "he basically fabricated costs to place on the invoices in order to

-6-

look as though [EVW] had spent money." In fact, the audit uncovered numerous irregularities in addition to fabricated costs.

The government brought criminal charges in May 2008, indicting Armitage on various fraud and false-claims counts. A superseding indictment, filed in April 2009, added Willson and EVW itself as defendants. In March 2010, the district court granted Willson's motion to sever, ordering that Armitage be tried separately. A second superseding indictment, filed on June 4, 2011, charged Willson with nine counts of wire fraud, 18 U.S.C. § 1343, seven counts of false claims, id. § 287, one count of false statements to a federal official, id. § 1001(a)(2), and a related conspiracy count, id. § 371. The false claims counts against Willson charged two false invoices under the 7050 agreement and five false invoices under the 7101 agreement, and the wire fraud counts were based on the advances EVW received on these invoices from Commerce Funding. The false statements count was based on Willson's comments to the DOT auditor, while the conspiracy count charged an agreement between Willson and Armitage to prepare the false invoices, deceive the DOT auditor, and defraud the FTA.

On June 6, 2011, Willson went to trial on the eighteen-count superseding indictment. The "core" of the government's case was that the invoices in question had falsely represented that EVW was satisfying the 50 percent funding match requirement. With respect to the 7101 invoices in particular, the government argued

that the funding match requirement had reset under the 7101 agreement, that Willson knew the requirement had reset and that EVW could not meet it, and that Willson falsely represented that the FTA was not paying over 50 percent of EVW's costs. He did all this in order to pay himself and Armitage and to support a newly established side venture, HSM Systems ("HSM"), that they co-founded. In addition, the government argued that these invoices were false because they each contained inflated, mislabeled, and falsified costs.

The government presented testimony from several witnesses, including the Congressman and Mary Thomas, and introduced extensive documentary evidence concerning EVW's financial activities. The government also introduced the testimony of Julie Cashman, a Senior Auditor for the Defense Contract Audit Agency, who conducted a forensic review of EVW's invoices to determine whether "the 50 percent matching [requirement] was met," "the expenses claimed were eligible," and "the company had actually spent the money that it had claimed [it spent]."

Cashman made two findings of particular importance. On the basis of the company's bank statements, Cashman testified that EVW had received approximately $780,000 in the 2005 calendar year, of which $724,000 (or 93%) came from FTA grant payments. Yet each of the 7101 invoices claimed that during this period the FTA's share of EVW's expenses was no more that 50 percent. Additionally,

EVW had claimed approximately $1.6 million in eligible expenses under the 7101 agreement, but had spent less than half that amount ($778,000). Second, in attempting to reconcile the 7101 invoices with EVW's "source documents" -- that is, the bills, records, and other data evidencing the company's actual expenses -- Cashman found a bounty of individual errors and inconsistences on each invoice.

The defense countered that Willson was a scientist, not an accountant. The individual irregularities in Willson's invoices were a product of his unfamiliarity with proper accounting practices, innocent mistakes, or both. Willson also testified that he understood the 50 percent funding match requirement to apply to the battery project as a whole (that is, to the 7050 and 7101 agreements collectively), and defense counsel maintained that the FTA had not covered more than 50 percent of EVW's costs since the project's inception. Willson also said that he relied on PVTA and FTA officials to review his invoices and catch any mistakes, and that he assumed when these agencies covered the invoices that his accounting practices were acceptable.

On June 21, 2011, the jury convicted Willson on the remaining conspiracy count,[2] six counts of wire fraud, and four

---

[2] After the defense rested, Willson moved for a judgment of acquittal. On June 17, 2011, the district court granted the motion as to the count of obstructing a federal auditor and the portion of the conspiracy count charging a conspiracy to obstruct the auditor.

counts of false claims based upon the government's charges concerning the four 7101 invoices that Commerce Funding had reimbursed. The jury acquitted Willson on the remaining counts of wire fraud and false claims, which related to the two 7050 invoices and the fifth and final 7101 invoice.

The district court denied Willson's post-verdict motions for judgment of acquittal and a new trial, and Willson filed a timely notice of appeal.

## II.

Willson first argues that the district court erred in denying his post-verdict motion for judgment of acquittal, Fed. R. Crim. P. 29, because the government's evidence was insufficient to prove beyond a reasonable doubt that he intentionally submitted false or fraudulent claims or conspired to defraud the FTA. We review a preserved challenge to the sufficiency of evidence de novo "to determine 'whether any rational factfinder could have found that the evidence presented at trial, together with all reasonable inferences, viewed in the light most favorable to the government, established each element of the particular offense beyond a reasonable doubt.'" United States v. Poulin, 631 F.3d 17, 22 (1st Cir. 2011) (quoting United States v. Medina-Martinez, 396 F.3d 1, 5 (1st Cir. 2005)); see United States v. Pires, 642 F.3d 1, 7 (1st Cir. 2011). "We need not be convinced that a guilty verdict was the only one available on the evidence, but merely that 'a

plausible rendition of the record' supports [it]." United States v. Vázquez-Botet, 532 F.3d 37, 60 (1st Cir. 2008) (quoting United States v. Ortiz, 966 F.2d 707, 711 (1st Cir. 1992)); see Poulin, 631 F.3d at 22 ("The court's only inquiry is whether the guilty verdict 'is supported by a plausible rendition of the record.'" (quoting Ortiz, 966 F.2d at 711)).

The jury convicted Willson on the counts for false claims and wire fraud that stemmed from the first four 7101 invoices he submitted in 2005. The government's evidence was sufficient for a jury to conclude that these invoices were false or fraudulent because they (1) misrepresented that EVW was satisfying the funding match requirement and (2) sought reimbursement for ineligible, inflated, and fictitious expenses.

EVW was in severe financial distress by early 2005. Former EVW communications director Curt Pressier testified that EVW's financial situation was "dire" and that the company stopped matching the FTA's funding contribution in November of 2004. And Willson himself testified that EVW was "out of money" by the end of 2004 and that he stopped drawing a salary in October of 2005. Willson also informed Armitage in a May 2005 email, months before EVW was awarded the 7101 agreement, that FTA funds would constitute nearly 100 percent of EVW's cash receipts during FY 2005. The government's expert confirmed that the actual figure for the FTA's contributions, 92.85 percent, was not far from Willson's estimate.

-11-

During this period, Willson submitted the four 7101 invoices, which represented that EVW had incurred over $1.2 million in eligible expenses from January to September of 2005, and sought reimbursement from the FTA for just under half that amount. Each invoice also stated that, to date, the FTA had covered no more than 50 percent of EVW's "drawn and pending" expenses. The logical import of these representations is that, in order to comply with the funding match requirement, EVW had contributed at least $600,000 in non-federal funding to the battery project over this nine-month interval. But EVW had almost no independent funding in 2005, let alone funding in excess of $600,000.[3]

Willson argues that even if the funding match requirement did reset under the 7101 agreement, and his invoices were therefore inaccurate, the government failed to show that he understood the requirement had reset and submitted the 7101 invoices nonetheless.

_____

[3] Willson reverts to his trial court argument that, reading the local share requirement to apply to EVW's cumulative expenses over the 7050 and 7101 agreements, the four 7101 invoices accurately represented that EVW had met its obligations. This argument is unconvincing for a number of reasons. As an initial matter, Willson's proposed construction of the funding match requirement is based on a superseded version of the FTA's Master Agreement. The only evidence countenancing that EVW contributed over 50 percent of the battery project's cumulative costs is a spreadsheet that Armitage gave to the DOT investigator during the 2006 audit. That spreadsheet contains almost no information on the sources of EVW's outside capital and includes over $1.6 million in "in-kind" contributions from Armitage himself and another unidentified source. Moreover, there is no evidence to show that these "in-kind" payments, assuming they were actually made, were approved contributions under the Master Agreement.

Willson's purported belief that the funding match requirement had not reset is easily rejected. Willson admitted that he was directly involved in preparing the 7101 agreement application, which stated that the "previously approved" budget amount for the project was "$0.00" and identified EVW's "local share" as 50 percent of its future costs. Willson also reset his "rolling accounting" to zero on the first 7101 invoice he submitted, demonstrating that he understood the 7101 and 7050 budgets to be distinct. Finally, Willson made several misleading statements to federal authorities concerning EVW's financial status, supporting the conclusion that he knowingly concealed EVW's inability to meet the funding match requirement.

There was also ample evidence to show that individual claims in the 7101 invoices were false or fraudulent. Julie Cashman identified discrepancies in each of the 7101 invoices. In some, Willson sought reimbursement for real but ineligible costs, including EVW's debt payments to Armitage and its outstanding tax liabilities. But in others, Willson flatly misstated the source, timing, or both of EVW's expenses.[4] This evidence corroborates

_____

[4] For example, on the second invoice, Willson claimed that EVW spent $172,772.18 in April of 2005 on "licensing fees." He later testified that this expense was actually incurred in 2002 for an equipment purchase. Similarly, on the third and fourth 7101 invoices, Willson claimed $80,000 in expenses for equipment that he knew EVW had not yet (and ultimately never) purchased, and another $24,010 for "Debt and Interest" expenses that had actually been used to purchase Armitage a new vehicle.

Mary Thomas's testimony that Willson admitted during the 2006 audit to duplicating claims from earlier invoices and to fabricating and inflating other expenses.

Willson offers explanations for each of these alleged discrepancies, but the jury was not obliged to accept them. It is also worth remembering that, throughout 2005, Willson and Armitage were simultaneously managing their newly established business HSM. At trial, Willson testified that he told the PVTA and FTA that federal funds would not be diverted to HSM. However, the government proffered evidence that Willson not only charged HSM expenses to the FTA grant, but also attempted to conceal that fact through mislabeling and redaction. This evidence lends additional support to the government's argument that Willson knowingly included false or fraudulent expenses on the 7101 invoices.

The government's evidence was also sufficient to convict Willson of the alleged conspiracy with Armitage to defraud the FTA. This count required proof of "an agreement, the unlawful objective of the agreement, and an overt act in furtherance of the agreement." United States v. Mubayyid, 658 F.3d 35, 52 (1st Cir. 2011), cert. denied 132 S. Ct. 2378 (2012) (quoting United States v. Barker Steel Co., 985 F.2d 1123, 1127-28 (1st Cir. 1993)) (internal quotation marks omitted); see United States v. Medina-Martinez, 396 F.3d 1, 5 (1st Cir. 2005). In a single paragraph, Willson challenges the sufficiency of the government's

-14-

evidence as to the first element--the existence of a conspiratorial agreement.[5]  His challenge fails.

A "conspiracy may be based on a tacit agreement shown from an implicit working relationship." United States v. Patrick, 248 F.3d 11, 20 (1st Cir. 2001); see also United States v. Gomez, 255 F.3d 31, 35 (1st Cir. 2001) ("The conspiratorial agreement need not be explicit and the proof thereof need not be direct.").  There is no dispute that Willson and Armitage worked closely together and discussed EVW's financial troubles, including the company's inability to meet the funding match requirement.  Additionally, both men took steps to hide EVW's financial troubles from federal authorities.  It is also clear that both Willson and Armitage benefited from the conspiracy.  During 2005, when almost all of EVW's cash receipts came from federal funds, Willson received over $100,000 from EVW, Armitage received over $200,000, and both used FTA funding to support their side venture HSM.  Thus, a reasonable jury could easily find that a tacit agreement to defraud the FTA existed between Willson and Armitage.

## III.

The district court did not err by refusing to issue two theory-of-defense instructions that Willson had requested. Generally, "[a] criminal defendant is entitled to an instruction on

---

[5]  We bypass the government's argument that Willson waived his challenge to the conspiracy count by failing to develop that challenge.  See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990).

-15-

the proposed theory of defense when the theory is a valid one, and the 'evidence adduced at trial, taken in the light most flattering to the accused, . . . plausibly support[s] the theory.'" United States v. Djokich, 693 F.3d 37, 47 (1st Cir. 2012) (second and third alterations in original) (emphasis omitted) (citation omitted) (quoting United States v. Ramos-Paulino, 488 F.3d 459, 461 (1st Cir. 2007)); see also United States v. Powers, 702 F.3d 1, 8 (1st Cir. 2012) ("[A] defendant is entitled to an instruction on his theory of defense provided that the theory is a legally valid one and there is evidence in the record to support it."). "The burden is on the defendant, as the proponent of the theory, to identify evidence adduced during the trial that suffices to satisfy this standard." Ramos-Paulino, 488 F.3d at 462. We treat Willson's objections as preserved and our review is de novo. United States v. Allen, 670 F.3d 12, 15 (1st Cir. 2012).

A court's "failure to give a requested instruction on the defendant's theory of the case is reversible error only if the requested instruction (1) was substantively correct; (2) was not substantially covered elsewhere in the charge; and (3) concerned an important point in the case so that the failure to give the instruction seriously impaired the defendant's ability to present his defense." United States v. Rose, 104 F.3d 1408, 1416 (1st Cir. 1997). Cases satisfying all three Rose factors are "relatively rare." United States v. Gonzalez, 570 F.3d 16, 21 (1st Cir. 2009)

(quoting United States v. Prigmore, 243 F.3d 1, 17 (1st Cir. 2001)) (internal quotation mark omitted).

A.   The Condonation Instruction

Willson proposed a two-paragraph "Good Faith" instruction, which followed from his argument that he lacked the requisite intent to defraud the PVTA and FTA.  The first paragraph informed the jury that good faith was "a complete defense to the charges against [Willson]" because good faith was "inconsistent with knowingly making false, fictitious, or fraudulent claims."  It also explained that it was "entirely the government's burden to prove . . . beyond a reasonable doubt that [Willson] did not act in good faith."  See, e.g., United States v. Callipari, 368 F.3d 22, 33 (1st Cir. 2004), vacated on other grounds, 543 U.S. 1098 (2005).

The second paragraph then directed the jury to consider any evidence of condonation on the part of PVTA or FTA officials. Specifically, Willson had argued that he had relied on these officials to review and correct his invoices, and that he reasonably inferred when the FTA paid for the invoices that he "was doing [them] well enough and everything was right."  In that vein, the second paragraph sought to instruct the jury as follows:

> You may consider, for instance, any and all evidence of the Pioneer Valley Transit Authority's and Federal Transportation Administration's actions or omissions, or deficiencies in the manner in which those agencies implemented and enforced their rules, to the extent that you find such evidence bears on the issue of whether Christopher Willson had the requisite state of mind.  You may find that the Federal Transit Administration's and

> Pioneer Valley Transit Authority's review and approval of [EVW]'s invoices, or failure to alert [EVW] to problems with the invoices submitted by Willson, if relied upon by him, negates evidence, if there is any, that Christopher Willson knowingly made false claims or acted with an intent to defraud.

At the June 20, 2011 charge conference, the government made only minor objections to the good faith instruction's first paragraph, but opposed the condonation charge in its entirety. It argued that the record did not evince any condonation on the part of PVTA or FTA officials, and that, even if it did, the defense was free to argue that point without the additional language. The district court agreed.

Willson argues that the good faith instruction actually given was insufficient and that he was "entitled to a specific instruction on the relevance of [the] PVTA and FTA's 'condonation' of the invoices at issue." He relies principally on our opinion in United States v. Josleyn, 99 F.3d 1182 (1st Cir. 1996). There, the defendant was charged with defrauding Honda, his employer, by accepting kickbacks from prospective Honda dealers. Id. at 1184. The court had instructed the jury on the defendant's "theory of the case," which was that Honda "knew of and condoned; that is, gave tacit approval to the activities . . . alleged in the indictment." Id. at 1194 (emphasis added). The district court declined, however, to issue the defendant's proposed instruction, which would have told the jury that the government had to prove beyond a reasonable doubt that Honda had not condoned his activities. Id.

-18-

On appeal, this court found no error in the district court's instruction, on the grounds that it had "unmistakably permitted the jury to consider all the condonation evidence" and that "[n]o more was required." Id.

Even if we assume dubitante that Willson's proposed condonation instruction is substantively consistent with our decision in Josleyn, the district court rightly denied the instruction on another basis. Taken in the light most favorable to Willson, the record in this case does not plausibly support the alleged condonation.

The dispute in Josleyn was over the language of the district court's condonation instruction, not over the question of whether condonation had occurred at all. By all accounts, the defense in Josleyn had presented sufficient evidence to show that Honda executives could have known that their representatives accepted kickbacks and chose to look the other way. Josleyn, 99 F.3d at 1194 (noting that the government conceded that Josleyn's evidence "would have permitted the jury to find that . . . executives at the highest levels of Honda implicitly condoned" his conduct); see also United States v. Josleyn (Josleyn II), 206 F.3d 144, 160 (1st Cir. 2000) ("The jury heard evidence as to the management's alleged condonation and testimony that American Honda consistently paid lower salaries and then conveniently looked the other way and allowed bribe-taking to supplement those salaries.").

Indeed, this evidentiary support was essential to Josleyn's defense that he lacked the requisite intent to defraud Honda. Without some proof that Honda executives knew about the kickbacks, Josleyn could not have reasonably believed that they "condoned" it. See Josleyn II, 206 F.3d at 154.

In contrast, there is virtually nothing in the record here to suggest that any PVTA or FTA employee could have known, let alone did know, that the 7101 invoices contained the false representations alleged in the indictment. The only support Willson musters is his own testimony that Keith Henry, a PVTA employee, corrected a few errors on some of the 7101 invoices Willson submitted. This evidence says little, however, about whether Henry condoned the false and fraudulent representations that the government alleges these invoices contained. As Willson acknowledged at trial, PVTA employees did not "get to see the records . . . [or] look at all the files that support[ed]" EVW's claimed expenses. Without this information at his disposal, Henry could not have identified that EVW's funds were insufficient to meet the funding match requirement or that the individual expenses Willson claimed were inaccurate. Moreover, the government introduced documentary and testimonial evidence to show that Willson interfered with the ability of federal authorities to identify these falsehoods by, inter alia, misrepresenting EVW's finances during preparations for the 7101 agreement, concealing his

relationship with HSM, and mislabeling and redacting information in individual invoices.

B.    The Reasonable Interpretation of Regulations Instruction

The district court also properly rejected Willson's proposed "reasonable interpretation" instruction. This instruction related to Willson's argument that the funding match requirement in fact permitted accounting over both agreements, such that EVW had to match the total funds it received rather than its funding on an agreement-by-agreement basis. Willson also claimed that the funding match requirement fairly could be interpreted as allowing EVW to meet its required share through various in-kind contributions.

Willson's requested reasonable interpretation instruction explained:

> You may find that ambiguities exist in the regulations, contracts, and rules that the prosecution alleges governed the receipt of federal money from the Federal Transit Administration by [EVW]. If you find that ambiguities exist, then to prove that Christopher Willson knowingly presented false claims upon the Federal Transit Administration or that he intended to defraud, the prosecution must prove beyond a reasonable doubt that the claims were false under all objectively reasonable interpretations of the regulations, contracts, and rules. That is to say, Christopher Willson cannot be convicted of knowingly presenting false claims or be found to have intended to defraud the Federal Transit Administration if there is an objectively reasonable interpretation of the ambiguous regulations, contracts, or rules under which the claims presented were actually valid.

To support his request for the instruction, Willson cited United States v. Prigmore, 243 F.3d 1, 17 (1st Cir. 2001), in which we

-21-

held that defendants are "entitled to have their intent assessed in the light of the interpretation of the underlying [legal] requirements that is most congenial to their case theory and yet also objectively reasonable."

At the charge conference, Willson modified his request rather dramatically. He abandoned the suggestion that the jury should determine whether his interpretation was objectively reasonable, explaining that it was "really for the Court to make that determination as a threshold matter." Indeed, the instruction Willson initially requested by motion overlooked Prigmore's clear rule that "if the evidence at trial gives rise to a genuine and material dispute as to the reasonableness of a defendant's asserted understanding of applicable law, the judge, and not the jury, must resolve the dispute." 243 F.3d at 18. And Willson's counsel argued that "if the Court finds that under an objectively reasonable interpretation, for example, the 50-50 requirement, that what he did was not improper, I think that we're entitled to this kind of an instruction."[6]

Willson argues that the trial judge erred in refusing to give his instruction under the three-part Rose test cited above. See 104 F.3d at 1416. Specifically, he argues that the instruction

---

[6] The government opposed the reasonable interpretation instruction, noting that in response to a mid-trial motion in limine Willson had filed, the government had not presented evidence on the proper interpretation of the various contracts and regulations at issue. Again, we bypass the government's argument that the objection was not preserved.

he sought was substantively correct under Prigmore; that it was not covered in the court's general good faith instruction or elsewhere in the court's charge; and that it concerned his main theory of the case such that not presenting it to the jury seriously impaired his ability to mount a defense. For its part, the government largely ignores the Rose factors and primarily argues that Willson failed to meet his initial burden of demonstrating that the "evidence adduced at trial, taken in the light most flattering to" him "plausibly support[ed] the theory" encapsulated in his requested instructions. Ramos-Paulino, 488 F.3d at 461. The government also maintains that the regulations Willson cites as ambiguous had been superseded at the relevant time, and that in any event Willson's interpretation was not objectively reasonable.

Given the lack of evidence presented at trial as to what (if any) interpretation of the relevant regulations Willson was purportedly following in preparing the invoices, we find the government's primary argument compelling. Willson appears to believe that the Prigmore rule entitles defendants to a jury instruction that effectively puts a thumb on the scale in their favor whenever their attorneys can articulate a plausible-sounding undeveloped argument that a given statute or regulation is ambiguous. Not so.

The Prigmore rule is designed to protect defendants from being convicted for conduct that they reasonably concluded was

-23-

legal or that they could not reasonably have known was illegal. Indeed, we have been explicit that the rule is "rooted in the due process-based 'fair warning requirement.'" Prigmore, 243 F.3d at 17 (citing United States v. Lanier, 520 U.S. 259, 265-67 (1997)); see also United States v. Rowe, 144 F.3d 15, 21-22 (1st Cir. 1998) (suggesting, in dicta, a rule like the one later adopted in Prigmore, and quoting Dunn v. United States, 442 U.S. 100, 112 (1979), for the precept that "fundamental principles of due process . . . mandate that no individual be forced to speculate, at peril of indictment, whether his conduct is prohibited").

Accordingly, the core holding of Prigmore is that a court must give an instruction presenting a defendant's interpretation of the legal requirements he is charged with violating when the defendant presents evidence that he actually held an objectively reasonable belief that his conduct conformed to those requirements. This, of course, was the situation in Prigmore itself. The defendants in that case were charged with conspiring to defraud and impair the functioning of the FDA by not filing reports and information supplements required under certain conditions. See 243 F.3d at 3, 13-15. The defendants maintained that they reasonably believed those conditions had not been met, because they interpreted one key regulatory clause, "affecting the safety or effectiveness of the device," as limited by a separate clause, "intended . . . conditions of use." See id. at 15 (alteration in

original) (internal quotation marks omitted). How the defendants interpreted these phrases was the "primary defense theme at trial," and they presented evidence that the interpretation they urged at trial was consistent with the interpretation they had advanced in previous communications with the FDA. Id. at 13-14. Because the defendants' interpretation was objectively reasonable and supported by evidence, we held that failing to so instruct the jury was reversible error. Id. at 24.

Here, in contrast, Willson presented virtually no evidence at trial that he actually held the interpretation that he argues the court was obligated to present to the jury. By his own admission, he never actually read any of the applicable regulations. In fact, perhaps the best evidence as to what he believed when preparing the invoices -- the contents of the invoices themselves -- cuts against him. Specifically, the invoices he submitted under the 7101 agreement reset the balance of drawn and pending FTA funds to zero -- evidence that he understood EVW was not allowed to carry over contributions it made under the 7050 agreement to meet the funding match requirement under the 7101 agreement. In the absence of evidence that he actually held the interpretation he advanced at trial, Willson did not raise the prospect that he faced conviction for conduct he reasonably concluded was legal, thus violating the due process fair warning requirement. Accordingly, Willson was well outside the heartland

of Prigmore, and the district court properly denied both his request to evaluate the reasonableness of an alternate interpretation and his proffered jury instruction.

As Willson does not argue that Prigmore's logic should be extended, we reach no conclusion as to whether a Prigmore instruction may be required in other circumstances as well.

Affirmed.