# United States Court of Appeals
## For the First Circuit

No. 13-2392

UNITED STATES OF AMERICA,

Appellee,

v.

RONALD SERUNJOGI,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

[Hon. Nancy Torreson, U.S. District Judge]

Before

Torruella, Dyk,[*] and Thompson,
Circuit Judges.

Clifford B. Strike, with whom Strike, Goodwin & O'Brien, was
on brief, for appellant.
Renée M. Bunker, Assistant United States Attorney, with whom
Thomas E. Delahanty II, United States Attorney, was on brief, for
appellee.

September 24, 2014

---

[*] Of the Federal Circuit, sitting by designation.

**THOMPSON, Circuit Judge**.  When his friend and countryman needed a bride to secure his stay in the United States, Ronald Serunjogi was the best man for the job.  But after seeing to this marriage in haste, Ronald is now repenting at leisure, serving four months in prison, and one year of supervised release, four months of which must be spent in home confinement, after a jury found him guilty of conspiracy to defraud the United States government.  Specifically, Ronald was convicted of conspiring with Samson Sengoonzi to arrange a sham marriage in order to secure Samson a change in his immigration status to which he would not otherwise be entitled.[1]  On appeal, Ronald argues that the evidence admitted at trial was insufficient to support his conviction, and that the district court erred in calculating his sentence.  After careful consideration, we affirm both Ronald's conviction and his sentence.

## I.

### BACKGROUND

Because Ronald is challenging the sufficiency of the evidence, we will recite the facts in the light most compatible with the jury's verdict.  See, e.g., United States v. Polanco, 634 F.3d 39, 40 (1st Cir. 2011); United States v. Troy, 618 F.3d 27, 29 (1st Cir. 2010).

---

[1]Rather than risk reader confusion over the similar-sounding surnames, we will refer to the defendant as Ronald and his co-conspirator as Samson.  No disrespect is intended.

## A. The Wedding Planner

Every wedding needs a planner--someone with experience who can tend to the details and guide the bride and groom over the hurdles of their most important day.  Ronald is a nurse by profession, but for his friend Samson, he was a most capable wedding planner.  A native of Uganda, Ronald emigrated to the United States in 1999 and was issued an Exchange Visitor Visa.  In 2002, Ronald settled in California, where he married for the first time.  The marriage ended in divorce in 2003, although the final decree was not issued until 2006.  Ronald then moved to Maine and, as the ink dried on the decree, married for the second time.  That marriage produced one child before ending in 2011.  In 2007, Ronald had a brief affair with Alice May--a woman who played a bit part in his romantic history, but would assume a much larger role in this case.  Presently, in what is perhaps a triumph of hope over experience, Ronald is married to his third wife, Cassandra Linton, with whom he has a second child.

Ronald met Samson at a party at a friend's house.  Like Ronald, Samson was a native of Uganda; unlike Ronald, Samson's permission to remain in the United States had expired.  As an "overstay," Samson had a problem; Ronald had the solution--Alice May.

## B. The Bride Wore Camo

In the summer of 2008, May was, by her own account, not in a good place.  She was "doing a lot of drugs, alcohol, and, at that time . . . pretty much didn't care" about her life.  Although she testified that her memory of that time was not good, she recalled having several conversations with Ronald during which he would "ask if [she] knew anybody that would marry somebody to get a green card or if [she] would."  May initially declined, but Ronald persisted, raising the topic "[p]retty much every time [they] talked."  According to May, Ronald told her, "Whoever would marry somebody for a green card would get money."

The would-be bride finally succumbed to Ronald's importuning.  On August 27, 2008, May signed a marriage certificate at Lewiston City Hall.  She testified that she had no recollection of who was with her at the time, but Samson's signature appears on the certificate beside that of his bride.[2]  Five days later, May received $400 that Samson had wired to her through Western Union.  On October 22, 2008, at Samson's behest, Ronald picked May up at her home and drove her to the wedding.  May testified that she had been drinking and was dressed "like [she] just was cleaning"; in fact, she was wearing a camouflage tank top.  Ronald drove her to a private home where a notary public performed the rather spartan

_____

[2]The defense stipulated that pursuant to state law, both parties are required to be present to apply for and receive a valid marriage license.

-4-

nuptials.  The groom wore a suit, but did not provide a ring.
Instead, the couple borrowed a ring from the officiant for Samson
to place on the bride's finger ("something borrowed") and the bride
mimed placing a ring on the groom's finger.

Following the brief ceremony, Ronald drove the bride back
to his house; the groom followed with a friend in a separate car.
While at Ronald's house, May observed Samson as he handed Ronald "a
lot of money."  Ronald then gave May $800 or $900 before pocketing
"a good amount" for himself.  A short time later, Ronald and Samson
dropped May off at her home.  May testified that she did not intend
to actually be married to Samson, nor did she ever live with him.

## C. The Newlywed Game

When May became pregnant in September 2009, the father
was not her new husband, but rather, the same man who fathered her
younger child.  During her pregnancy, both Samson and Ronald asked
her to sign papers for Samson's green card; initially, she refused.
Finally, on February 24, 2010, after Ronald called her and
explained the relevant paperwork, May signed an I-130 Petition for
Alien Relative.  May gave birth in, appropriately enough, May.  Six
weeks later, Samson called her and asked her to attend an
appointment in South Portland the following day, in order to secure
his green card.  Samson and Ronald picked May up the next morning,
along with her two children.  During the ride, Ronald, a veteran of
the process, directed the couple in a rehearsal of what they would

likely be asked, and what they should say. In particular, they agreed that if asked what TV show they liked, they would answer "NCIS." Ronald also pointed out that the presence of May's infant child of another father "would look bad," and so Ronald remained in the car with the infant while the couple and May's older child attended the interview in the immigration office.

Unsurprisingly, the interview did not go well. Immigration Service Officer Kurt Pelletier questioned the couple separately. Both May and Samson gave their address as 20 Garfield Street, Apartment 25--Ronald's address--although both claimed to live there with May's one child. No mention was made of either the new baby or Ronald living there. Samson provided a lease to Pelletier for the Garfield Street apartment, with "Alice Sengoonzi and Samson Sengoonzi" listed on it. Pelletier asked May and Samson a series of questions, individually, about their wedding and what they watched on Saturday night. May forgot her lines and, instead of NCIS, talked about watching a movie. Samson, on the other hand, missed his cue; when asked about Saturday night, he said "my favorite show is NCIS"--a statement that Pelletier felt was not an answer to the question he had posed. There were other red flags; according to Pelletier, they gave conflicting answers to several questions, although they both agreed that they "met through a friend named Ronald."

After failing to win over Pelletier in this high-stakes newlywed game, the couple received not "lovely parting gifts" but a notice of intent to deny ("NOID"). Having determined that this was possibly a fraudulent marriage, Pelletier sent the notice to May at Ronald's Garfield Street address.

**D. The Nervous Groom**

On July 19, 2010, Samson and Ronald went to the immigration center to file a rebuttal. Pelletier happened to be working at the counter that day, and recognized Ronald, whom he had previously interviewed when Ronald applied for his permanent residence. According to Pelletier, Ronald "did most of the talking" and provided Pelletier with several documents: a "proof of marriage authenticity" purportedly signed by May, a bank statement from Five County Credit Union in the name of Samson Sengoonzi which showed a deposit transfer from Ronald for $25,[3] and a Liberty Mutual receipt showing that an insurance agreement was purchased on behalf of Samson and paid for with Ronald's credit card. Unhappily for Samson, the documents that were proffered to bolster the authenticity of his marriage had the opposite effect. After

---

[3]The bank account was opened in Samson's name on June 30, 2010, and May's name was added to the account on July 7, 2010. May testified that she agreed to add her name to the joint account because Samson "said that he needed more proof of our marriage." Notably, Five County Credit Union has a minimum opening deposit requirement of $25.

-7-

viewing them, Pelletier referred the matter for criminal investigation.

Pelletier also performed a simple online search and determined that May had given birth six weeks before the initial interview, yet she failed to mention anything about that child. Pelletier sent a second NOID in February 2011. In response to the second NOID, Pelletier received additional documents, including: paperwork from Five County Credit Union, insurance coverage, a Time Warner Cable bill, a W-2 in Samson's name, and a letter dated March 12, 2011, entitled "proof of marriage" that, again, purported to be signed by Alice G. Sengoonzi. May testified that she did not write or sign either letter. The immigration office requested another interview, but Samson cancelled it, claiming that his wife was "out of state at the moment visiting with the rest of her family in Alabama." The second interview never occurred.

At some point in 2010 or 2011, Samson gave May a Ford Explorer. Although she could not recall when she received the vehicle, May testified that Samson gave it to her because it was "[p]retty much more money towards . . . the marriage." May further testified that she received additional money from Samson and Ronald either through Western Union or personally, but she was unable to remember the amounts.

After she learned that she was under investigation regarding the marriage, May cooperated in the investigation and

-8-

signed a plea agreement.  In June 2011, after she had begun cooperating with Agent James Bell of the Department of Homeland Security, May received a series of text messages that she forwarded to Bell.  The text conversation began on June 10, 2011, when May missed a phone call on her cell phone.  Because the number was unfamiliar, May texted back "Who this."  This exchange followed, between May's cell phone and a cell phone later determined to belong to Ronald:

> "Its me ronald"
>
> "Who"
>
> "U remember Samson?"
>
> "Ya Im busy"
>
> "Don't need anything but to let u know if immigra[n]t guys came n ask u if samson gave you money or car to marry him just say no."

When nearly an hour passed with no response from May, Ronald texted again:

> "U got my text m[e]ss?
>
> "Ya"
>
> "Coz they have been checkin some people if they were paid.  And if u say yes ur put in jail for 5[]years."

After forwarding these texts to Agent Bell, May agreed to "wear a wire" to record a conversation between herself and Samson on June 28, 2011.  Although the tape of this conversation was not

-9-

introduced into evidence,[4] Bell testified that, during the recording, May asked Samson, "Why did you have Ronald text me?" and later, "[S]o you had him text me?"

In February 2012, a superseding indictment was filed charging Ronald with conspiring "to participate in a sham marriage for the purpose of defrauding the United States." The indictment alleged two objects of the conspiracy: (1) "for Samson to acquire a change of his United States immigration status to which he would not otherwise have been entitled by falsely representing to agencies of the United States Government that the marriage into which Samson entered . . . was bona fide when in fact it was not," and (2) "for [May] to profit financially by accepting payments from co-conspirators, including Samson and Ronald, in exchange for participating in a sham marriage and helping Samson obtain a change of immigration status."

A jury trial commenced in April 2013. At the close of the government's case, and again at the conclusion of the trial, Ronald moved for judgment of acquittal; both motions were denied. After a three-day trial, the jury convicted Ronald of conspiracy to defraud the government. Samson, who had been charged with conspiracy, document fraud, and making a false statement, pled guilty to the latter two counts and did not cooperate with the

_____

[4]The Assistant U.S. Attorney made a representation that the tape, which implicated Samson, was not offered into evidence because it was not relevant to the case against Ronald.

government, nor testify at Ronald's trial. At his sentencing hearing, Ronald was given four months in prison and one year of supervised release, four months of which must be spent in home confinement. Ronald timely appealed. He raises two main issues for our consideration.

## II.

### DISCUSSION

### A. Sufficiency of the Evidence

Ronald first argues that the evidence adduced at trial was insufficient to support his conviction. We review challenges to the sufficiency of the evidence de novo, "viewing all evidence, credibility determinations, and reasonable inferences therefrom in the light most favorable to the verdict, in order to determine whether the jury rationally could have found that the government established each element of the charged offense beyond a reasonable doubt." United States v. Portalla, 496 F.3d 23, 26 (1st Cir. 2007) (citing United States v. Ossai, 496 F.3d 25, 30 (1st Cir. 2007)). However, we will not "weigh the evidence or make credibility judgments; these tasks are solely within the jury's province." United States v. Hernandez, 218 F.3d 58, 64 (1st Cir. 2000) (citing United States v. Ortiz, 966 F.2d 707, 711 (1st Cir. 1992)).

Ronald was charged under 18 U.S.C. § 371 with conspiracy "to defraud the United States, or any agency thereof." To prove that Ronald conspired to defraud the United States, the government

-11-

must establish the existence of an agreement, the unlawful object of the agreement, and an overt act in furtherance of that agreement. United States v. Floyd, 740 F.3d 22, 28 (1st Cir. 2014). Here, the unlawful objective of the conspiracy was marriage fraud. Pursuant to 8 U.S.C. § 1325(c), "Any individual who knowingly enters into a marriage for the purpose of evading any provision of the immigration laws shall be imprisoned for not more than 5 years, or fined not more than $250,000, or both." Finally, the government must also establish the defendant's knowing participation in the conspiracy. Floyd, 740 F.3d at 28.

Ronald argues that the government did not offer credible evidence of the existence of a conspiracy, much less his knowing and voluntary participation in that conspiracy. Chiefly, he challenges the credibility of the government's primary witness, asserting that May's testimony was so rife with inconsistencies that no rational jury could have credited her account. To support this argument, Ronald notes that, by May's own admission, her drug use in 2008 rendered her memory of that time "not good." He points to her confusion over dates and her inability to remember whether Samson accompanied her to City Hall as proof that her testimony is not worthy of belief. While it is clear to us that May was far from an ideal witness, the very same instances that Ronald cites demonstrate that a reasonable jury could have found her to be forthright, even if flawed. As the government's witness,

-12-

rather than testify to events she could not recall, she freely admitted when she could not remember. Even in an instance where a fact could readily be established with supporting evidence (i.e. the visit to City Hall with Samson), and thus she was unlikely to be challenged on cross-examination, May stuck to her guns and admitted that she could not remember. Similarly, she did not recall receiving $400 from Samson in September 2008, and when shown the Western Union records memorializing that transaction during cross-examination, the following colloquy took place:

> Q: "Did you just happen to forget that earlier?"
>
> A: "I don't remember having it, no. I don't remember that."
>
> Q: "You remember it now, though, don't you?"
>
> A: "No, I don't remember fully but it's on paper so obviously I - - it happened."

A rational jury could perceive that exchange as the testimony of a person who was being completely honest about what she could and could not remember, and therefore find her to be credible.

On appeal, Ronald's burden is a heavy one; to prevail, he must demonstrate that "viewing the evidence and reasonable inferences in the light most favorable to the prosecution, no rational jury could have convicted him." Polanco, 634 F.3d at 45. Because jurors are in the best position to judge a witness's credibility, sufficiency challenges are a "tough sell." Id. We will not usurp the jury's role of weighing evidence and making

-13-

credibility judgments; instead, we "must reject only 'those evidentiary interpretations . . . that are unreasonable, insupportable, or overly speculative.'" Hernandez, 218 F.3d at 64 (quoting United States v. Spinney, 65 F.3d 231, 234 (1st Cir. 1995)). The jury heard from both May and Ronald, and was capable of weighing their credibility. Indeed, a rational jury could have credited May's testimony, discounted Ronald's, and determined that Ronald was a knowing and willing participant in the conspiracy. In short, we are not sold. We must "uphold any verdict that is 'supported by a plausible rendition of the record.'" Id. at 64 (quoting Ortiz, 966 F.2d at 711)).

Undaunted, Ronald next offers a theory of innocent explanations for each damaging piece of the government's remaining evidence. He denies playing any part in arranging and concealing the sham marriage, and casts a far more benign light on his actions. According to Ronald, he did all the talking at Samson's second appearance at the immigration office merely as one friend helping another. Likewise, the transaction at Five County Credit Union was a loan from one good friend to another. He implies that Samson may have stolen his lease at some point when it was left out on a table. Similarly, although he admits that the incriminating text messages came from his phone, Ronald proposes that Samson must have used his phone to send the texts.

Despite Ronald's innocent explanations for each of these pieces of evidence, we must focus on the evidence as a whole. Floyd, 740 F.3d at 30. It is not sufficient to offer "a plausible theory of innocence . . . because the issue is not whether a jury rationally could have acquitted but whether it rationally could have found guilt beyond a reasonable doubt." United States v. Seng Tan, 674 F.3d 103, 107 (1st Cir. 2012). The jury heard Ronald's testimony as well as that of May and was entitled to draw its own inferences and conclusions from all of the evidence presented.

"It suffices if the conclusions that the jury draws from the evidence, although not inevitable, are reasonable." Floyd, 740 F.3d at 30 (citing United States v. Laboy-Delgado, 84 F.3d 22, 26-27 (1st Cir. 1996)). Our review of the record persuades us that, when viewed in the light most favorable to the verdict, the evidence was sufficient for a rational jury to conclude that Ronald had knowingly and voluntarily entered into an agreement with Samson and May to facilitate a sham marriage in order to provide a green card for Samson and cash for May, and that the trio undertook several overt acts in furtherance of that agreement. Ronald, remember, had approached May on more than one occasion asking if she or anyone she knew "would marry someone to get a green card." He picked May up, at Samson's request, and drove her to the wedding. Following the ceremony, he accepted cash from Samson, gave May her cut, and pocketed the rest. His role didn't end

there; after the wedding, Ronald coached the couple in how to deceive the immigration officials. No wedding planner could have done more. These overt acts are more than sufficient for a jury to conclude that Ronald conspired to defraud the government.

## B. Sentence

Ronald also challenges the sentence imposed by the district court. Following the verdict, the probation department prepared a Presentence Investigation Report ("PSI"). The report noted that Ronald had a difficult start in life: his father was killed by the Idi Amin regime when he was two years old, and his mother thereafter worked long hours to support him and his eight siblings. Several of those siblings have since died of AIDS, leaving behind a number of children whom Ronald helps to support. Since emigrating, Ronald earned a nursing degree and worked in several healthcare settings, most recently as a Licensed Practical Nurse. He has no criminal history and no history of substance abuse or mental illness.

A disposition hearing was convened on September 30, 2013, and continued on October 25, 2013. After reviewing the PSI, the court calculated the guideline sentencing range ("GSR"). Since Ronald was convicted of violating 18 U.S.C. § 371, a base level of 11 applied. See U.S.S.G. §§ 2X1.1, 2L2.1(a). Because the court found that Ronald was "an organizer or facilitator of the offense" pursuant to U.S.S.G. § 3B1.1(c), two points were added, bringing

-16-

the adjusted offense level to 13.  The government's recommendation of a further enhancement for obstruction of justice was rejected. Ronald's request for downward adjustments because the offense was not committed for profit and because the conspiracy was not completed were similarly rejected.

These calculations yielded a GSR of 12 to 18 months. After noting that Ronald was "a very hard worker," "a good provider," and a "good and generous friend," the court recognized that Ronald was "too good of a friend, and that in order to help [his] fellow countryman, [Ronald] broke the laws of this country." The court imposed a sentence of four months in prison and one year of supervised release, four months of which would be served in home confinement.

Before us, Ronald contends that the district court erred by not applying U.S.S.G. § 2L2.1(b)(1), which allows for a three-level deduction "[i]f the offense was committed other than for profit."  Had this guideline been properly applied, he argues, his base offense level would have been 8 rather than 11.  Ronald also says that he was entitled to an additional three-level deduction under U.S.S.G. § 2X1.1(b)(2) because he and Samson "failed to complete all the acts necessary for the successful completion of the substantive offense," reducing his base offense level to 5. Before we address Ronald's arguments, we must first determine whether there is a live case or controversy sufficient to invoke

the jurisdiction of this Court. See United States v. Duclos, 382 F.3d 62, 65 (1st Cir. 2004).

## 1. Mootness

The government contends that Ronald's appeal of his sentencing is moot, because he was released from custody in May 2014. However, Ronald may still be serving four months of home confinement and assuredly faces a year of supervised release. For us to have subject-matter jurisdiction, Ronald "must have 'suffered, or be threatened with, an actual injury traceable to [the government] and likely to be redressed by a favorable judicial decision.'" United States v. Rene E., 583 F.3d 8, 19 (1st Cir. 2000)(quoting Duclos, 382 F.3d at 65). Ronald's one year of supervised release, as a restriction of his personal freedom, is an injury that would be redressed were he to prevail in this appeal. See, e.g., United States v. Weikert, 504 F.3d 1, 12 (1st Cir. 2007) (holding that an individual on supervised release has "a substantially diminished expectation of privacy"). Accordingly, the sentencing issue is not moot.

## 2. Reasonableness

"We review criminal sentences for reasonableness, using an abuse of discretion standard." United States v. Leahy, 668 F.3d 18, 21 (1st Cir. 2012) (citing Gall v. United States, 552 U.S. 38, 46 (2007)). This review is bifurcated; "we first determine whether the sentence imposed is procedurally reasonable and then determine

whether it is substantively reasonable." Id. (quoting United States v. Clogston, 662 F.3d 588, 590 (1st Cir. 2011)). Ronald challenges the calculation of his GSR, which appears to be a procedural argument. Accordingly, we will review Ronald's sentence for procedural reasonableness.

For a sentence to be procedurally reasonable, the district court must have properly calculated the GSR. See United States v. Martin, 520 F.3d 87, 92 (1st Cir. 2008)(explaining that procedural errors include: "failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence-including an explanation for any deviation from the Guidelines range"). When assessing procedural reasonableness, our abuse of discretion standard is multifaceted. Leahy, 668 F.3d at 21. "[W]e review factual findings for clear error, arguments that the sentencing court erred in interpreting or applying the guidelines de novo, and judgment calls for abuse of discretion simpliciter." Id. (citations omitted).

Sentencing judges are urged to "follow a specifically delineated roadmap when sentencing under the now-advisory federal sentencing guidelines." United States v. Madera-Ortiz, 637 F.3d 26, 29 (1st Cir. 2011) (quoting United States v. Dávila-González, 595 F.3d 42, 46 (1st Cir. 2010)). The first step on this road is

-19-

to establish the GSR, before moving on to consider the appropriateness of departures and weighing the sentencing factors enumerated in 18 U.S.C. § 3553(a) along with any other relevant considerations. Id. at 29-30 (citing United States v. Pelletier, 469 F.3d 194, 203 (1st Cir. 2006)). "The purpose of this exercise is to ensure that the sentence imposed will be the product of the district court's individualized and fact-intensive decision making." Id. at 30 (citing Martin, 520 F.3d at 92).

The defendant bears the burden of proving by a preponderance of the evidence that he is entitled to a downward adjustment of the base offense level. United States v. Sachdev, 279 F.3d 25, 27 (1st Cir. 2002) (citing United States v. Rizzo, 121 F.3d 794, 801 (1st Cir. 1997)). The district court held that Ronald failed to meet his burden of proving that the offense was not committed for profit. Our review of the transcripts of the disposition hearings reveals that, in arriving at the GSR, the court took great pains to consider and address Ronald's arguments. Although the parties agree that the base offense level was correctly set at 11, Ronald contends that he was entitled to two separate deductions from that level because the offense was not committed for profit, and was not substantially completed.

After hearing arguments, the sentencing judge made specific findings of fact. She reviewed May's testimony that Samson handed Ronald a large amount of cash, and that Ronald gave

-20-

her a portion of the money and pocketed the rest. Although evidence did not establish the precise amount of money, and Ronald argued that the amount he took was merely used to defray expenses, the court was unconvinced. Further, the court found that May profited by the offense and because Ronald aided and abetted the conduct, he was also responsible for the profit.

The court also found that the substantive offense, defrauding the government, was substantially completed because the marriage took place, the immigration interview was completed, and Ronald and Samson had sent in all of the paperwork they were using to try to establish the validity of the marriage. In short, there was nothing left to do but wait and hope that the immigration authorities would be duped. Again, the court determined that Ronald had failed to meet his burden, holding that he was not entitled to a decrease under U.S.S.G. 2X1.1.

With due deference to the district court's "unique coign of vantage and the deferential standard of review," we find no clear error in the court's findings. Leahy, 668 F.3d at 23 (quoting United States v. Gobbi, 471 F.3d 302, 315 (1st Cir. 2006)). Neither can we quibble with the court's interpretation or application of the guidelines. There was ample evidence that both Ronald and May received cash following the sham marriage; it is immaterial precisely how much money Ronald received.

The question of whether the offense was substantially completed is a judgment call, there being no suggestion that there was any further act to perform to successfully defraud the government. The phony nuptials had taken place, and fake documents had been submitted to a government agency by Ronald and Samson. They were thwarted only when the immigration authorities were unpersuaded by the proffered documents and launched the investigation that led to Ronald's conviction. "It is the nearness of the crime to achievement--not the precise nature of the involuntary interruption--that defeats the reduction available for conspiracies and attempts that have not progressed very far." United States v. Chapdelaine, 989 F.2d 28, 36 (1st Cir. 1993) (holding that a defendant who had equipped himself for a robbery and arrived at the designated location, only to be thwarted by the untimely departure of the targeted armored truck, was not entitled to a reduction under U.S.S.G. 2X1.1(b)). We have little doubt that, had the immigration authorities accepted the story that the happy couple lived together and shared a joint account, the fraud would be complete. As previously stated, we review judgment calls for abuse of discretion, and we discern none here; the sentence was procedurally reasonable.

To the extent that Ronald may question the substantive reasonableness of his sentence, we note that the sentencing judge recognized her duty to "impose a sentence that is sufficient but

not greater than necessary to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment for the crime, to afford adequate deterrence, and to protect the public."  She weighed Ronald's background and work ethic before setting a sentence that was well within the 12 to 18 month range of the GSR.  The district court having taken all relevant factors into account, we will not second-guess the sentence imposed.

## CONCLUSION

For the reasons set out at length above, we are unconvinced by each of Ronald's arguments.  Ronald's conviction and sentence are **AFFIRMED**.